## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number:  **12-00456-jw**
Adversary Proceeding Number:  **15-80147-jw**

## ORDER AND INJUNCTION

The relief set forth on the following pages, for a total of 33 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**11/30/2016**



Entered: 11/30/2016

US Bankruptcy Judge
District of South Carolina

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Congaree Triton Acquisitions, LLC,<br><br>Debtor(s). | C/A No. 12-00456-JW<br><br>Adv. Pro. No. 15-80147-JW<br><br>Chapter 7 |
| Robert F. Anderson,<br><br>Plaintiff(s),<br><br>v.<br><br>Carroll A. Campbell<br>John D. Cattano,<br><br>Defendant(s). | **ORDER AND INJUNCTION** |

This matter comes before the Court upon the Motion for Summary Judgment ("Motion") filed by the Chapter 7 Trustee, Robert F. Anderson ("Trustee"). Carroll A. Campbell ("Campbell") and John D. Cattano ("Cattano") filed a response to the Motion, and the Court held a hearing on the matter. Pursuant to Fed. R. Civ. P. 52, which is made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052, the Court makes the following findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

1.      Campbell and Cattano allege that Christian Jensen ("Jensen") approached Cattano in late 2010 about the opportunity to purchase two companies dealing in natural stone, Triton Stone of Charlotte, Inc. ("TSCLT") and Triton Stone of Myrtle Beach, Inc. ("TSMB"), which Jensen indicated were highly profitable and sound businesses.[2] Jensen was a founder of Triton Stone

---

[1]      To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such and vice versa.

[2]      The following allegations of Campbell and Cattano, which are included in the Findings of Fact are based on the allegations in their amended complaint filed with the Court of Common Pleas for Richland County (later referred

1

Management, LLC which owned 50% of TSCLT and TSMB. Thereafter, Cattano contacted Campbell about the business opportunity, for which Campbell expressed an interest in pursuing. Campbell and Cattano began negotiating with Jensen, Joshua Kessler ("Kessler"), the manager of TSCLT and TSMB, and Randy Mathis ("Mathis"), another founder of Triton Stone Management, LLC, about the purchase of TSCLT and TSMB, at which time, Campbell and Cattano were provided financial information about the companies.

2.      Campbell and Cattano further allege that in reliance on this financial information, they formed Congaree Triton Acquisitions, LLC ("Debtor") to purchase the assets of TSCLT and TSMB.

3.      On December 31, 2010, an initial Operating Agreement was executed for Debtor. On January 4, 2011, Debtor was organized as a limited liability company under the laws of South Carolina. A Certificate of Existence was filed with the Secretary of State of South Carolina on March 4, 2011.

4.      On March 1, 2011, Debtor entered into an Asset Purchase Agreement ("A.P.A.") with TSCLT and TSMB to purchase substantially all of the assets of those companies ("Purchase Transaction"). Campbell and Cattano, as individuals, were not parties to the A.P.A.; however, they did sign the A.P.A. in their individual capacities for the sole purpose of acknowledging their liability on certain guaranties, as further described below.

5.      To complete the Purchase Transaction, Debtor paid a total of $2,975,000, which consisted of a cash payment of $729,800 and seven notes given to the owners of TSMB and TSCLT or their related entities. These purchase obligations were as follows:

---

to in this Order as the "Second State Court Action") as well as in statements made at hearings in this and other proceedings and in their affidavits submitted in support of their response to the Trustee's Motion.

- Debtor executed a promissory note in the amount of $1,500,000 in favor of 9002 Dunes, LLC, a company created by Michella Williams ("Williams") and Federico Glidemeister ("Glidemeister") who were 50% owners of TSMB and TSCLT. Campbell and Cattano personally guaranteed the promissory note with 9002 Dunes, LLC;

- Debtor executed three promissory notes in the amounts of $200,000, $100,000, and $30,000 in favor of FGSW, LLC, another company owned by Williams and Glidemeister. All three promissory notes with FGSW, LLC were personally guaranteed by Campbell and Cattano;

- Debtor executed two promissory notes in the amounts of $295,200 and $36,000 in favor of Triton Stone Southaven, a company owned by Mathis. Both of the promissory notes with Triton Stone Southaven were personally guaranteed by Campbell and Cattano; and

- Debtor executed a promissory note in the amount of $84,000 in favor of Triton Stone New Orleans, a company owned by Jensen. Campbell and Cattano personally guaranteed the promissory note with Triton Stone New Orleans.

Also as part of the Purchase Transaction, Debtor entered a distribution agreement with Triton Stone Group, LLC ("TSG"), in which Debtor obtained access to TSG's inventory sources and an exclusive distribution territory in exchange for Debtor paying TSG two percent of its gross sales ("Distribution Agreement"). As part of the agreement, Cattano guaranteed to TSG the payment of all sums due to TSG by Debtor, including any of Debtor's outstanding invoices for inventory. The guaranty under the Distribution Agreement as well as the seven guaranties entered to facilitate Debtor's purchase of TSCLT and TSMB's assets are collectively referred to as "Seller Financing Guaranties."

3

6.     The A.P.A. also provided that, with limited exceptions, TSCLT and TSMB would
be responsible for any of those companies' liabilities that existed on the closing date of the
Purchase Transaction, which was March 11, 2011. Further, the A.P.A. included a disclaimer of
representations by TSCLT and TSMB, which stated:

> (A) . . . none of [TSCLT and TSMB], any of its affiliates or any of their respective
> officers, directors, employees or representatives make or have made any other
> representation or warranty, express or implied, at law or in equity, in respect
> of the seller, the business or any of the purchased assets, including with respect
> to (I) merchantability or fitness for any particular purpose, (II) the operation of
> the business by the purchaser after the closing in any manner other than as used
> and operated by [TSCLT and TSMB] or (III) the probable success or
> profitability of the business after the closing, and (B) . . . none of [TSCLT and
> TSMB], any of its affiliates, or any of their respective officers, directors,
> employees or representatives will have or be subject to any liability or
> indemnification obligation to [Debtor] or to any other person resulting from
> the distribution to [Debtor], its affiliates or representatives of, or [Debtor's] use
> of, any information relating to the purchased assets or the business, including
> any information, documents or material made available to the [Debtor],
> whether orally or in writing, in certain "data rooms," management
> presentations, functional "break out" discussions, responses to questions
> submitted on behalf of [Debtor] or in any other form in expectation of the
> transactions contemplated by this agreement. Any such other representation or
> warranty is hereby expressly disclaimed.

7.     On March 9, 2011, Triton Stone Group LLC entered a buy-back agreement with
Debtor, in which it agreed to purchase unsold stone slab bundles for 80% of their value ("Buy-
Back Agreement"). Campbell and Cattano were not parties to the Buy-Back Agreement.

8.     On March 11, 2011, Campbell and Cattano as Chief Executive Officer and Chief
Financial Officer of Debtor respectively authorized Debtor to borrow $1.5 million from Greenfield
Commercial Credit, L.L.C. As part of this transaction, Campbell and Cattano personally
guaranteed the loan.

9.     Campbell and Cattano allege that, shortly after the closing of the Purchase
Transaction, they discovered that Kessler had issued $600,000 in checks on the TSMB and

4

TSCLT's corporate accounts to vendors and suppliers for liabilities of TSMB and TSCLT days before the closing of the Purchase Transaction. Campbell and Cattano further allege that as result of the Purchase Transaction, TSMB and TSCLT's corporate accounts were closed and the $600,000 in checks were not honored, resulting in the vendors and suppliers making demands for payment on Debtor, Campbell and Cattano. According to the allegations, Kessler refused to make payment on these dishonored checks in violation of the A.P.A. and demanded that Debtor pay these pre-closing liabilities. Debtor eventually paid the liabilities from its funds to maintain good relations with Debtor's vendors and suppliers.

10.    Campbell and Cattano also allege that they subsequently discovered that the financial information of TSCLT and TSMB provided to them while they negotiated the Purchase Transaction was fraudulent as the information failed to account for a large number of invoices and other expenses of the companies, which resulted in a significant overvaluation of TSCLT and TSMB.

11.    Debtor, Campbell and Cattano, as co-plaintiffs, filed an action, with the assistance of counsel, in the Court of Common Pleas for Horry County on November 21, 2011 ("First State Court Action") against several defendants, including Triton Stone Group, LLC, Triton Stone Management, LLC, Triton Stone Southhaven, LLC, Kessler, Mathis, Gary Sena, Triton Stone Group New Orleans, LLC, Jensen, Jack Jensen, TSCLT, TSMB, FGSW, LLC, 9002 Dunes, LLC, Natural Stone Holdings, LLC, Federico Gildmeister, and Michella Williams (collectively "State Court Defendants").[3] The basis of the First State Court Action dealt with, among other allegations, the alleged misrepresentations of TSCLT and TSMB's financial information during the negotiations of the Purchase Transaction and the alleged issuance of $600,000 in checks by Kessler

---

[3]    While there were several other defendants in the First State Court Action, for the purposes of this Order, it is not necessary for the Court to list them.

shortly before the closing of the A.P.A. The First State Court Action included causes of action for fraud, constructive fraud, fraudulent concealment, negligent misrepresentation, breach of contract, breach of contract accompanied by a fraudulent act, unfair trade practices, indemnification, conversion, unjust enrichment, intentional interference with contractual relations, equitable relief, civil conspiracy, breach of duty of loyalty, breach of fiduciary duty, *ex rel.* claims, civil RICO, Sherman Act, negligent supervision, abuse of process and malicious prosecution.

12.    On January 26, 2012, Debtor, through Cattano, filed a petition for relief under Chapter 11 of the Bankruptcy Code and continued to operate, for a time, as a debtor-in-possession.

13.    Debtor filed schedules and statements on February 23, 2012, which were amended on March 13, 2012. Debtor's amended Schedule B lists the following under "Other contingent and unliquidated claims of every nature":

> claim [sic] against Triton Stone Group, LLC; Triton Partners Management Group; Triton Stone New Orleans; Triton Stone South Haven; Transportation Consultants, Inc.; Nikon Mfg. Inc.; NOLA Yard; Joshua Kessler; Randy Mathis; Christian Jensen; Jack Jensen; Katie Peralta for uit [sic] for fraud, negligent misrepresentation, breach of contract, unfair trade practices, indemnification, conversion, unjust enrichment, intentional interference with contractual relations, equitable releif [sic], and civil conspiracy
>
> claim [sic] against Transportation Consultants, Inc. Triton Stone Group, LLC, Triton Stone New Orleans, Jack Jensen, Christian Jensen, Katie Peralta and NOLA Yard for conversion of 4 containers of natural stone:
> container . . . value $13,740
> container . . . value $17,955
> 2 containers from International Stones, PVT with an approx value of $30,000
>
> Claims against vendors of previous owner for for [sic] payments made by debtor that were applied to debt of previous owner. See attached list.

Attached to the amended Schedule B is a detailed list of all the alleged payments made by Debtor totaling approximately $1.8 million to vendors that it asserts were applied to TSMB and TSCLT's pre-closing liabilities.

14.    On April 20, 2012, the First State Court Action was removed by Triton Stone Group, LLC to the United States District Court for the District of South Carolina.

15.    After motion and a hearing and upon a finding of cause, Debtor's bankruptcy case was converted to Chapter 7 on June 29, 2012, and the Trustee was appointed.

16.    On March 1, 2013, the First State Court Action was voluntarily dismissed without prejudice with the consent of, among others, the Trustee, Campbell and Cattano.

17.    On March 7, 2014, Campbell and Cattano, individually, filed a complaint in the Court of Common Pleas for Richland County against the same State Court Defendants ("Second State Court Action"). The factual basis of the Second State Court Action includes the alleged misrepresentations of TSCLT and TSMB's financial information during the negotiations of the Purchase Transaction and the alleged issuance of $600,000 in checks by Kessler shortly before the closing of the A.P.A. The Second State Court Action was subsequently transferred to the Court of Common Pleas for Horry County.

18.    Three days later, on March 10, 2014, the Trustee commenced an adversary proceeding in Debtor's bankruptcy case against several of the State Court Defendants ("Purchase Transaction Adversary"). The Purchase Transaction Adversary included several *ex rel.* claims brought as a result of Debtor's standing as the successor in interest to the assets of TSMB and TSCLT. These claims were based in part on TSMB and TSCLT's insolvency at the time of the Purchase Transaction and Kessler's issuance of $600,000 in checks to TSMB and TSCLT's vendors and suppliers shortly before the closing of the A.P.A.

19.    On April 24, 2014, Campbell and Cattano filed an amended complaint in the Second State Court Action, which included the following claims: fraud, constructive fraud, fraudulent concealment, negligent misrepresentation, unfair trade practices, unjust enrichment,

civil conspiracy, breach of fiduciary duty, indemnification, fraudulent inducement to create a limited liability company and malicious prosecution.

20.    On July 9, 2014, the court in the Second State Court Action entered an Order Granting Defendants' Motions to Dismiss in Part and Denying in Part. In this order the court held that Campbell and Cattano raised certain colorable individual claims; however, the court dismissed their claims based on civil conspiracy, breach of fiduciary duty and fraudulent inducement to create a limited liability company because they failed to state a claim under South Carolina law.

21.    On September 12, 2014, after notice and a hearing, including the consideration of the objection of Campbell and Cattano, the Court entered an Order Approving Settlement between the Trustee and Inga R. Ivey, Michella I. Williams and 9002 Dunes, LLC regarding certain claims raised in the Purchase Transaction Adversary ("9/12/14 Order"). The general terms of the settlement provided that Inga R. Ivey, Michella I. Williams and 9002 Dunes, LLC would pay $5,000 to the estate and subordinate their claims in Debtor's case, and the Trustee would release any claims Debtor may have possessed at the time of petition against Inga R. Ivey, Michella I. Williams and 9002 Dunes, LLC. No party appealed the 9/12/14 Order.

22.    On June 8, 2015, after notice and a hearing, including the consideration of the objection of Campbell and Cattano, the Court entered an Order Approving Settlement between the Trustee and Triton Partners Management Group d/b/a Triton Stone Management Group of Charlotte, LLC, d/b/a Triton Stone Management, LLC d/b/a Triton Stone Group of Charlotte, LLC, Triton Stone Group, LLC, Triton Stone Southaven, and Kessler regarding certain claims raised in the Purchase Transaction Adversary ("6/8/15 Order"). The general terms of the settlement provided that these defendants in the Purchase Transaction Adversary would pay the estate $250,000 and waive or withdraw the proof of claims they may have against the Estate, and the

Trustee would release any claims involving the Purchase Transaction that Debtor may have possessed at the time of petition against those defendants, their representatives and agents. According to the settlement, Randy Mathis, Christian Jensen, Jack Jensen and Gary Sena also received releases from liability No party appealed the 6/8/15 Order.

23.     On July 15, 2015, the Trustee filed the present adversary proceeding seeking declaratory judgments and permanent injunctive relief against Campbell and Cattano to prevent continuation of the Second State Court Action. The Trustee alleges that Campbell and Cattano's Second State Court Action involves derivative claims, which are property of the estate under 11 U.S.C. § 541, were previously settled or released by the Trustee as a result of the Court's prior final orders and that the prosecution thereof is in violation of the automatic stay under 11 U.S.C. § 362(a)(3).

24.     On September 4, 2015, Campbell and Cattano filed a motion to dismiss the present adversary proceeding as well as a request for the Court, in its discretion, to abstain from hearing the matter. After a hearing, the Court denied the motion to dismiss and determined that, at that time, the Court would not abstain from the present adversary. The Court also stayed the Second State Court Action on an interim basis to the extent provided under 11 U.S.C. § 362.

25.     Thereafter, the parties conducted discovery in this adversary proceeding pursuant to the Court's scheduling order entered on March 1, 2016. The scheduling order provided that:

> On or before March 31, 2016, any party objecting to the entry of final orders or judgments by this court on any issue in this adversary proceeding . . . shall file with this Court a motion request that this Court determine whether the matter is a core proceeding or otherwise subject to the entry of final orders or judgments by this court. . . . FAILURE OF ANY PARTY TO FILE A MOTION ON OR BEFORE THE DEADLINE PROVIDED IN THIS PARARGRAPH SHALL CONSTITUTE CONSENT BY SUCH PARTY TO THIS COURT ENTERING ALL FINAL ORDERS AND JUDGMENTS IN THIS PROCEEDING.

No party has filed a motion regarding the Court's authority to enter final orders or judgments.

26.     On June 1, 2016, Campbell and Cattano filed a Motion to Compel Complete Discovery Responses and Table of Authorities, which alleged that the Trustee had not fully complied with their discovery requests. This Motion to Compel was subsequently withdrawn on June 28, 2016.

27.     Also on June 1, 2016, the Trustee filed the Motion, requesting the Court grant summary judgment on all of his claims in the present adversary proceeding.

28.     Campbell and Cattano filed a response to the Motion on June 14, 2016, alleging that the Trustee has not satisfied his burden because there are disputed material facts relevant to this action. Attached to the response were two affidavits executed by Campbell and Cattano, which attested, among other things, that: (1)  Kessler, Mathis and Jensen proposed that Campbell and Cattano form Debtor during their negotiations; (2) Campbell and Cattano received false financial statements about TSMB and TSCLT during the negotiations of the Purchase Transaction; (3) Campbell and Cattano were uncomfortable with personally guaranteeing the liabilities of Debtor and would not proceed with the purchase of TSMB and TSCLT; (4) to reduce Campbell and Cattano's  concerns and to induce them to proceed with the Purchase Transaction, certain of the State Court Defendants agreed to execute the Buy-Back Agreement with Debtor and to personally indemnify Campbell and Cattano for any losses they incurred as a result of their personal guaranties; and (5) certain of the State Court Defendants did not honor their agreements under the A.P.A., the buy-back agreement, and the indemnification agreements.

29.     In their responses to the Trustee's interrogatories, which were included as an exhibit to the Trustee's Motion, Campbell and Cattano assert that their injuries in the Second State Court Action are their: (1) loss of investment, (2) lost opportunity costs and time, (3) losses as a result

of their personal guaranties, and (4) damages to personal credit, reputation and other financial

hardships.

30.    During the course of the present adversary proceeding, it was indicated to the Court

that the Trustee commenced this proceeding, in part, to fulfill his obligations under the Settlement

Agreement approved by the 6/8/15 Order. Specifically, the settlement agreement provides that:

> The Trustee will undertake his best efforts in good faith . . . without any warranty,
> representation, or guarantee by the Trustee as to success or as to the results thereof
> and with the good faith cooperation and efforts by the Settling Defendants to assist
> the Trustee in accomplishing the following actions based on the terms set forth
> below . . .
>
> [T]he Trustee will file an adversary proceeding in the Bankruptcy Court seeking an
> order from the Court enjoining Cattano and Campbell from maintaining and/or
> continuing the prosecution of the State Court Derivative Claims and seeking a
> declaratory judgment that the State Court Derivative Claims constitute derivative
> claims of the Debtor that are property of the Estate that, with Final Court Approval
> of the 9019 Settlement Agreement and the Settling Defendants' tender of Payment
> Consideration (as defined below), were settled by the Trustee and the Settling
> Defendants.

## CONCLUSIONS OF LAW

The Trustee alleges in the Motion that summary judgment is appropriate as to all his claims

because: (1) the undisputed facts demonstrate that all of the claims asserted in the Second State

Court Action are entirely derivative claims and property of the estate; (2) Campbell and Cattano

are judicially estopped from denying the estate's ownership of the claims in the Second State Court

Action; (3) the Trustee is entitled to a permanent injunction barring Campbell and Cattano from

prosecuting the Second State Court Action; (4) Campbell and Cattano are precluded from

relitigating claims the Trustee has already settled; and (5) Campbell and Cattano willfully violated

the automatic stay through their prosecution of the Second State Court Action. Campbell and

11

Cattano allege that there are disputed material facts that preclude the entry of summary judgment and that the Trustee has not satisfied his burden.[4]

The Court by its final orders of September 12, 2014 and June 8, 2015 authorized the settlement of all asserted causes of action owned by Debtor and its estate against certain of the State Court Defendants. Therefore, the essential issue before Court is whether those derivative actions, which seek to redress a wrong to the Debtor-LLC, are distinguishable from the causes of action asserted by Campbell and Cattano in the Second State Court Action.[5]

### Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure, as adopted by Fed. R. Bankr. P. 7056, provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The initial burden is on the moving party to demonstrate that there is no genuine dispute of material fact; which "then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Temkin v. Federick Cty. Comm'rs, 945 F.2d 716, 718–19 (4th Cir. 1991). The Court must "draw all reasonable inferences in favor of the nonmoving party and may not make credibility

---

[4]      In their response to the Motion, Campbell and Cattano allege that the Trustee is not entitled to summary judgment because the Trustee has not complied with Campbell and Cattano's discovery requests. However, shortly after the filing of the response to the Motion, the parties resolved their discovery dispute, and Campbell and Cattano were provided the requested information. The parties did not address any issues relating to discovery at the hearing on the Motion. Therefore, it appears to the Court that Campbell and Cattano are no longer pursing a denial of summary judgment on those grounds, and the Court will not address those arguments in this Order.

[5]      A derivative action is an action based on a wrong to a corporation in which one of the corporation's shareholders brings the action to redress the wrong to the corporation. 12B Fletcher Cyclopedia of the Law of Corporations § 5908 (2016). "Derivative suits arise in equity to enforce a corporate right that the corporation has failed, was unable or had refused to assert by court action." Id. at § 5911; see also Deborah A. DeMott & David F. Cavers, Shareholder Derivative Actions:  Law & Practice § 2.3 (2016).

determinations or weigh the evidence" when reviewing the facts produced by the parties. <u>Williams v. Staples, Inc.</u>, 372 F.3d 662, 667 (4th Cir. 2004).

**Final Authority**

Neither party addressed the Court's authority to enter final orders and judgments at the hearing on the Motion; however, since the Trustee seeks summary judgment, the Court finds it is appropriate to determine the Court's authority to enter final orders in this proceeding.

The Court entered a scheduling order on March 1, 2016 to expedite the disposition of this proceeding, including setting deadlines for completing discovery, filing motions, and filing joint pre-trial orders. A deadline of March 31, 2016 was provided in the scheduling order which required any party who challenged whether the present adversary proceeding is a core proceeding or otherwise subject to the entry of final orders or judgments by this Court to file a motion requesting the Court determine those issues. The scheduling order also stated that if the parties do not file a motion before that deadline, the party's failure would constitute consent to this Court entering all final orders and judgments in this proceeding.  Neither the Trustee, Campbell, Cattano nor any other party filed a motion to challenge the Court's authority to enter final orders and judgments in this proceeding. Therefore, it appears that the parties knowingly and voluntarily consented by implication to the Court's entry of final orders and judgments in this matter. <u>See</u> <u>Wellness Int'l Network, LTD v. Sharif</u>, __ U.S. __, 135 S.Ct. 1932, 1948, 191 L.Ed.2d 911 (2015).

**Judicial Estoppel**

The Trustee asserts that he is entitled to summary judgment because judicial estoppel bars Campbell and Cattano from denying the bankruptcy estate's ownership of the claims in the Second State Court Action. Specifically, the Trustee asserts that Campbell and Cattano, as officers of Debtor, were responsible for the accuracy of Debtor's schedules and that the Debtor's inclusion of

13

certain contingent and unliquidated claims in its Schedule B which are identical to the claims in

the Second State Court Action, judicially estops Campbell and Cattano from now asserting

personal ownership over those claims.

The Fourth Circuit has outlined the three essential elements to establish judicial estoppel:

> First, the party sought to be estopped must be seeking to adopt a position
> that is inconsistent with a stance taken in prior litigation. And the position sought
> to be estopped must be one of fact rather than law or legal theory.
> Second, the prior inconsistent position must have been accepted by the
> court. The insistence upon a court having accepted the party's prior inconsistent
> position ensures that judicial estoppel is applied in the narrowest of circumstances.
> . . .
> Finally, the party sought to be estopped must have intentionally misled the
> court to gain unfair advantage. Indeed, we have stated that this factor is the
> "determinative factor" in the application of judicial estoppel to a particular case.

Lowery v. Stovall, 92 F.3d 219, 224 (4th Cir. 1996) (citations and internal quotation marks

omitted).

For the purposes of summary judgment, the Court cannot conclude, based upon the

submissions, that Campbell and Cattano have taken inconsistent positions so as to trigger judicial

estoppel. The claims listed in Schedule B appear to be the claims included in the pre-petition First

State Court Action, which were brought by not only Debtor but also Campbell individually, and

Cattano individually, as co-plaintiffs.  Since the First State Court Action, Campbell and Cattano

have taken the consistent position that they have individual claims separate from Debtor's

corporate claims for the same causes of action arising from the same facts. Both individual and

corporate claims may arise from the same facts.  See In re Glo-Tex Int'l, Inc., C/A No. 07-06449-

jw, slip op. at 6–7 (Bankr. D.S.C. Nov. 30, 2010) ("The Court notes that the same conduct by

directors can produce both derivative and individual claims.").  Inclusion of these claims in

Debtor's schedules would be consistent with both Campbell and Cattano's current and previous

positions. Therefore, the Court finds that the Trustee has not satisfied his burden that he is entitled

to summary judgment on the basis that Campbell and Cattano are judicially estopped from asserting ownership of the claims in the Second State Court Action.

**Nature of Claims in Second State Court Action**

The Trustee also asserts that he is entitled to summary judgment because there is no dispute of material fact that the claims in the Second State Court Action are derivative and therefore are property of Debtor's bankruptcy estate.

"As a general rule, the right to pursue a derivative action is part of the bankruptcy estate under 11 U.S.C. § 541." Glo-Tex, C/A No. 07-06449-jw, slip op. at 4. Unless otherwise abandoned, the trustee has the exclusive right to bring and settle derivative actions; whereas, direct claims remain property of the creditor, who may prosecute and settle those claims. Id. at 2–3. To the extent that claims in the Second State Court Action are derivative, the Trustee has previously released those claims through his prior settlements with certain of the State Court Defendants. Therefore, Campbell and Cattano would be prohibited from prosecuting those claims.

Determining whether each claim is derivative or direct requires a review of the nature of and injuries associated with each claim under state law. See Id. at 3–7; In re Infinity Bus. Grp., Inc., C/A No. 10-06335-jw, 2011 WL 9375422 at *3–*6 (Bankr. D.S.C. June 22, 2011); In re Greenwood Supply Co., 295 B.R. 787, 796–797 (Bankr. D.S.C. 2002).

*Choice of Law*

As an initial matter, the Court must determine the choice of law that applies to the claims in the Second State Court Action.[6] In determining the extent of a debtor's property interest, a

---

[6]    Campbell and Cattano's amended complaint in the Second State Court Action includes a malicious prosecution claim; however, this claim was later dismissed with prejudice by the agreement of the parties, including Campbell and Cattano, on January 5, 2016. Therefore, the Court will not consider it for the purposes of this Order.
        Also the State Court dismissed Campbell and Cattano's claims for Civil Conspiracy, Breach of Fiduciary Duty and Fraudulent Inducement to Form a Limited Liability Company because these claims failed to state a claim for which relief could be granted under South Carolina law pursuant to S.C. R. Civ. P. 12(b)(6). Therefore, this Court will not consider them in this matter.

bankruptcy court should apply the conflicts rules of the forum state in the absence of a compelling federal interest. In re Merritt Dredging Co., Inc., 839 F.2d 203, 205–06 (4th Cir. 1988). The forum state for both this adversary proceeding and the Second State Court Action is South Carolina. Therefore, this Court will apply South Carolina choice of law principles.

The Second State Court Action includes several claims based in tort law.[7] Under South Carolina choice of law principles, "the substantive law governing a tort action is determined by the state in which the injury occurred, commonly referred to as the *lex loci delicti* rule." Rogers v. Lee, 414 S.C. 225, 230, 777 S.E.2d 402, 405 (Ct. App. 2015) (citing Boone v. Boone, 345 S.C. 8, 13, 546 S.E.2d 191, 193 (2001)). In tort claims based on misrepresentations, "[t]he place of the wrong is not where the misrepresentations were made but where the plaintiff, as a result of the misrepresentation, suffered a loss." Lister v. NationsBank of Delaware, N.A., 329 S.C. 133, 143, 494 S.E.2d 449, 455 (Ct. App. 1997). After review of the pleadings, it appears that Campbell and Cattano's alleged injuries for these claims occurred in South Carolina as the injuries relate to the incorporation, management and ownership of Debtor and from the Purchase Transaction, all of which occurred in South Carolina. Therefore, South Carolina law would apply to these claims.

The Second State Court Action also includes an indemnification claim, which is based in contract law. In addition, any claim based on a breach by the obligee of a guaranty agreement is based in contract law. Unless otherwise agreed to by the parties, "[a] contract is controlled by the laws of the State in which it is made and is to be performed." Doctors Hosp. of Augusta, L.L.C. v. CompTrust AGC Workers' Compensation Fund, 371 S.C. 5, 9, 636 S.E.2d 862, 864 (2006) (internal quotation marks omitted). To the extent that the indemnification claim is based on the A.P.A., the choice of law provision in that document, which provides for the application of South

---

[7]      The remaining tort claims include: fraud, constructive fraud, fraudulent concealment, and negligent misrepresentation.

Carolina law, would control.[8] As to any claim based on a breach by the obligee of a guaranty agreement, all of the Seller Financing Guaranties are governed by South Carolina law, except for Cattano's guaranty on the Distribution Agreement, which is governed by Mississippi law.

The Court has not found any South Carolina cases determining the choice of law principles for claims based on equitable indemnification, unfair trade practices and unjust enrichment. However, these claims are generally based in either contract or tort law.[9] Applying either contract or tort principles as well as the most significant relationship test,[10] the choice of law for these claims would be South Carolina as the Purchase Transaction and Campbell and Cattano's injuries appear to have occurred in South Carolina.

### Determination of Nature of Claims

Under South Carolina law, the determination of whether a plaintiff's claim is direct or derivative will depend on the nature of the plaintiff's injury as well as any fiduciary relationship owed to the plaintiff. "A shareholder's suit is derivative if the gravamen of his complaint is an injury to the corporation and not to the individual interest of the shareholder." Hite v. Thomas & Howard Co. of Florence, Inc., 305 S.C. 358, 361, 409 S.E.2d 340, 342 (1991) overruled on other grounds in Huntley v. Young, 319 S.C. 559, 462 S.E.2d 860 (1995). "'A stockholder may sue individually . . . when he has sustained a loss separate and distinct from that of other stockholders

---

[8]      As to any alleged oral indemnification agreement between Campbell, Cattano and the State Court Defendants, the Court is unable to conclude the choice of law as the pleadings do not indicate where the parties made this alleged agreement.

[9]      See Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 213 (E.D.Pa. 2000) (noting that consumer fraud statutes may be based in both tort and contract law); Gibbs-Brower Int'l v. Kirchheimer Bros. Co., 611 F. Supp. 122, 126 (N.D. Ill. 1985) (noting that "unjust enrichment cases fall somewhere between contract and tort" when determining which choice of law principle applies to a claim for unjust enrichment).

[10]      The Restatement (Second) of Conflict of Laws suggests that for claims of restitution and unjust enrichment, courts should apply "the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence . . . ." Restatement (Second) of Conflict of Laws § 221 (2016). Therefore, the Court has also reviewed the unjust enrichment, equitable indemnification and unfair trade practices claims under this test and determined that South Carolina law would apply under this test.

generally.'" Ward v. Griffin, 295 S.C. 219, 221, 367 S.E.2d 703, 704 (Ct. App. 1988) (quoting 19 Am. Jur. 2d Corporations § 2245, at 147 (1986)).  Further, "[a]n individual action is allowed if the alleged wrongdoers owed a fiduciary relationship to the stockholder and full relief to the stockholder cannot be had through a recovery by the corporation." Brown v. Stewart, 348 S.C. 33, 50, 557 S.E.2d 676, 685 (Ct. App. 2001).

Initially, it should be noted that neither party has argued that Campbell and Cattano's claims in the Second State Court Action are based on the fiduciary relationship exception under South Carolina law. Nothing in the record indicates that the relationship between Campbell and Cattano and the State Court Defendants rose to the level of a fiduciary relationship.[11] In addition, "case law describes the commercial relationship between a buyer and seller as ordinarily not fiduciary." State v. Parris, 353 S.C. 582, 593, 578 S.E.2d 736, 742 (Ct. App. 2003) rev'd on other grounds in 363 S.C. 477, 611 S.E.2d 501 (2005). Therefore, the extent that Campbell and Cattano's claims are direct or derivative will be determined by the extent those claims raise separate and distinct injuries.

In their responses to the Trustee's interrogatories, Campbell and Cattano defined their individual injuries as to these causes of action as: (1) loss of their personal investment in Debtor, (2) lost opportunity costs and time, (3) losses resulting from their personal guaranties, and (4) damages to their personal credit, reputation and other financial hardships. The Court will consider each of these injuries as they relate to the allegations in the Second State Court Action.

---

[11]    Further, the Court notes that while the recovery to the estate by the Trustee's settlement with the State Court Defendants would not likely result in Campbell and Cattano being able to receive full payment for their alleged losses, this alone would not convert any possible derivative claims brought by them into direct claims. See Bowen v. Houser, C/A No. 12-00173-MBS, 2012 WL 2873873 (D.S.C. July 13, 2012) (rejecting individual plaintiffs' arguments that they have direct claims when plaintiffs brought "classic derivative suit" for which any recovery by the corporation would be seized by the FDIC, acting as the receiver for the corporation).

*Loss of Personal Investment:*

Generally, under South Carolina law, injuries resulting in the diminution of the value of a shareholder's stock are considered a derivative injury as the decline in the corporation's stock was a common injury suffered by all of the shareholders. See Rivers v. Wachovia Corp., 665 F.3d 610, 615 (4th Cir. 2011) (applying S.C. and N.C. law) ("A derivative lawsuit is thus the vehicle for a shareholder to litigate the injuries that result in the diminution in value of the corporation's stock"). Further, a shareholder's claim for lost investment would generally be derivative as that shareholder is in fact alleging that the value of the stock or ownership interest that they received by investing in the corporation has decreased to zero. See Wesolek v. Layton, 871 F.Supp.2d 620, 633 (S.D. Tex. 2012) (holding that an individual's claims for lost investment are derivative when the harm was to the corporation). This loss in investment stems from the harm to the corporation as the corporation's harm causes the decrease in stock value, which directly flows to the individual shareholders. See Bowen v. Houser, 2012 WL 2873873 at *2 (D.S.C. July 13, 2012)("A decrease in the value of all outstanding stock is in no way 'separate' or 'distinct' from the harm to the corporation that causes such a decrease; rather it flows directly from this harm.").

In the present matter, Campbell and Cattano allege that their loss of personal investment in Debtor was a separate and distinct injury. However, by investing, Campbell and Cattano, in exchange, received an ownership interest in Debtor. At the time they invested in Debtor, their ownership interest was valued at the amount they had invested. It was Debtor, using the funds invested, that carried out the Purchase Transaction according to the terms of the A.P.A.[12] By

---

[12]    Campbell and Cattano's affidavits submitted in support of their response to the Motion suggest that Campbell, Cattano, and the Campbell Family Trust paid the purchase price directly to TSCLT and TSMB from their personal checking accounts. However, the record indicates otherwise in that Campbell and Cattano first made equity contributions to Debtor and that Debtor paid the purchase price for the assets of TSMB and TSCLT. Campbell and Cattano's allegations in the amended complaint in the Second State Court Action allege that "[Debtor] financed the acquisition of the two asset-selling corporations through significant equity contributions of Campbell and Cattano." Further, Debtor's bank statements show that Debtor transferred $392,000 to McNair Law Firm on the closing date of

purchasing the assets of TSCLT and TSMB for an inflated value, Debtor was the party directly harmed by the Purchase Transaction as the transaction immediately decreased the value of Debtor. Campbell and Cattano's loss of investment flowed as a consequence of this harm to Debtor due to their ownership interest.

Further, Campbell and Cattano allege that Kessler's issuance of $600,000 in checks to the vendors of TSMB and TSCLT for pre-closing liabilities contributed to the loss of their investment in Debtor. The record indicates that Debtor, and not Campbell and Cattano, made the payments to honor the $600,000 in checks issued by Kessler pre-closing.[13]

Kessler's actions appear to breach TSMB and TSCLT's obligations under the A.P.A. which were owed to Debtor as purchaser.[14] Further, it was Debtor's payment of these liabilities which contributed to the decrease in Debtor's value. The harm resulting from Kessler's alleged issuance of $600,000 in checks for TSMB and TSCLT's pre-closing liabilities was to the corporation. Campbell and Cattano's loss of investment was a consequence of Debtor's loss in value. Therefore, Debtor is the proper party to recover for this alleged breach of the A.P.A. and Debtor's payment of these pre-closing liabilities.

Campbell and Cattano's injuries for their loss of investment are not distinct from the losses suffered by Debtor's other investors, owners and creditors. A recovery in full by the Debtor for the alleged harm would reinstate the value of Debtor, which would in turn make Campbell and

---

the Purchase Transaction as required under the A.P.A. and that the Campbell Family Trust deposited $242,409.39 into the Debtor's bank account shortly before the closing date.

[13]     Campbell and Cattano have not submitted any convincing evidence that they personally paid the vendors and suppliers that were issued checks by Kessler shortly before the closing of the Purchase Transaction. Rather, Debtor's amended Schedule B, which were certified under penalty of perjury on behalf of Debtor by Cattano, indicates that Debtor paid approximately $1.8 million (which appears to also include the alleged $600,000 in checks issued by Kessler) to vendors and suppliers for debts of the "previous owner" (i.e. TSMB and TSCLT).

[14]     For example, the A.P.A. stated that "[TSMB and TSCLT] shall retain, and shall be responsible for paying, performing and discharging when due all, and the [Debtor] shall not assume or have any Liabilities of [TSMB and TSCLT] existing on the Closing Date and arising from the period preceding the Closing . . . ."

Cattano's investment whole again. This injury for a loss of investment, as alleged herein, is derivative in nature.

To support their argument that their loss of investments are separate and distinct injuries. Campbell and Cattano have additionally relied on the Supreme Court of California's opinion in Sutter v. General Petroleum Corp., 28 Cal. 2d 525 (1946).[15]  In Sutter, the court held that an individual investor who received fraudulent representations about the quality of a steel island which induced him to form a corporation to lease the steel island, was entitled to recover for his investment in the corporation and lost opportunity costs when the steel island collapsed post-incorporation. Id. at 529–31. The Sutter court reasoned that the "tort [against the investor] was completed [pre-incorporation] except as to the injury" and that "[t]he injury resulted from the formation of a corporation and investments therein to carry on a project that could not be conducted because of the fraud." Id. at 531–32. In determining the extent of investor's injuries, the Court stated that:

> While ordinarily a stockholder may not sue individually for impairment of a corporation's assets rendering the stock worthless, yet here the result is merely one method of ascertaining the amount of damages suffered by [the investor]. He lost his investment which was represented by the stock, and its reduction in value would be the extent of his loss.

Id. at 531.

---

[15]    Sutter was cited by the Court of Appeals of South Carolina in Todd v. Zaldo, 304 S.C. 275, 403 S.E.2d 666 (Ct. App. 1991) but the facts here are distinguishable. In Zaldo, a majority shareholder brought claims against the minority shareholder of the corporation for alleged misconduct. Id. at 276, 403 S.E.2d at 667.  In determining that the majority shareholder's claim for injuries resulting from being a creditor of the corporation, the Court noted that the loan given by the majority shareholder was not "incurred as a result of misrepresentations or tortious act of [the minority shareholder]" and cited to Sutter as an example of a case finding the fraudulent inducement to invest in corporation. Id. However, South Carolina courts have not formally adopted the reasoning of or applied Sutter in a subsequent opinion. Further, in Zaldo, the representations occurred between two owners of a corporation; whereas the instant matter the representations occurred between investors of a corporation and a third-party that was independent of the corporation. Further, the Supreme Court of South Carolina's opinion in Adams v. Haselden, 112 S.C. 32, 99 S.E. 762 (1919), discussed in further detail below, suggests that Campbell and Cattano's injuries for their loss of investment are derivative claims.

To the extent that Campbell and Cattano are seeking to recover for their lost investment, this Court, in applying South Carolina law, is not inclined to adopt the reasoning of <u>Sutter</u>. Adoption of <u>Sutter</u> would appear to disregard the established principle of South Carolina law that injuries stemming from the general diminution of a corporation's stock value should be brought by a shareholder in a derivative claim. <u>See</u> <u>Rivers</u>, 665 F.3d 610, 614–15 ("Under . . . South Carolina law, the well-established general rule is that shareholders cannot pursue individual causes of action against third parties for wrongs or injuries to the corporation that result in the diminution of destruction of the value of their stock." (internal quotation marks omitted)).[16]

In addition, the Supreme Court of South Carolina addressed facts similar to both those in <u>Sutter</u> and in the instant matter in <u>Adams v. Haselden</u>, 112 S.C. 32, 99 S.E. 762 (1919), which held that the individual investors' claims under similar facts were derivative. In <u>Adams</u>, certain individuals received misrepresentations about the quality of a pecan grove from its seller. <u>Id.</u> Based on these misrepresentations, the individuals paid a portion of the purchase price of the pecan grove. <u>Id.</u> Thereafter, the individuals formed a company to pay the remaining portion of the purchase price for the pecan grove and manage the pecan grove. <u>Id.</u> The individuals who paid the portion of the purchase price prior to the company's formation were given stock in the company in exchange for their payment. <u>Id.</u> Soon after the purchase, it was discovered that the pecan grove was diseased, resulting in limited crop yields. <u>Id.</u>, 99 S.E. at 763. The individuals invested additional money into the pecan grove to improve its quality; however, the company eventually became insolvent. <u>Id.</u>, 99 S.E. at 762–63. The individual investors brought a claim against the estate of the seller for the amounts paid on the purchase price and the amounts paid to improve the property. <u>Id.</u> The Supreme

---

[16]   Further, adoption of <u>Sutter</u> would raise certain policy concerns, including the possibility of producing duplicative lawsuits, allowing double recovery and prioritizing certain shareholders over other shareholders who did not deal with the wrongdoers but are similarly harmed.

Court of South Carolina held that these "losses alleged are the losses of the corporation. Of course when corporations lose, their stockholders lose." Id., 99 S.E. at 763. Further, the court held that the "loss was through the wrecking of the corporation, and the corporation is the proper party to bring this suit so that the rights of all interest in the fund may be adjusted." Id.

While Adams is an older opinion, it has not been overruled and appears to be valid precedent under South Carolina law. The facts alleged in Adams are strikingly similar to the facts alleged in the instant matter. For these reasons, the Court is more persuaded by the holding in Adams and is not inclined to follow the reasoning of Sutter.[17] Therefore, the Court finds that the Campbell and Cattano's alleged loss of personal investment resulted from the harm to Debtor. As such, recovery by Campbell and Cattano for this injury would be derivative in nature.

*Lost Opportunity Costs and Time*

Campbell and Cattano's response to the Trustee's interrogatories also include as alleged injuries the lost opportunity costs and time resulting from the Purchase Transaction. However, when a corporation is harmed, a shareholder cannot bring a claim for lost opportunities or time because the failure of the corporation stems from the harm to the corporation and affects all of the corporation's owners equally. See Braun v. Buyers Choice Mortg. Corp., 851 So. 2d 199, 203 (Fla. App. 2003) (finding that "[t]he direct injury of lost opportunities is to [the Corporation] and equally affects both shareholders" and is therefore derivative); Pepe v. Gen. Motors Acceptance Corp., 604 A.2d 194 ("Nor can stockholders assert individual claims for wages or other income lost because of injuries assertedly done to their corporations."). Based on the allegations of the

---

[17]    Campbell and Cattano also suggest that the Court of Appeals for South Carolina's holding in Bivens v. Watkins, 313 S.C. 228, 437 S.E.2d 132 (Ct. App. 1993) and this Court's holding in In re Glo-Tex Int'l, Inc. support a finding that Campbell and Cattano's loss of investment is a separate and distinct injury; however, the Court finds that those two cases present different facts and are distinguishable from the instant matter.

amended complaint in the Second State Court Action and the record in this proceeding, these injuries stem from similar harm to that of Campbell and Cattano's loss of investment and are derivative.

*Losses on Personal Guaranties*

Campbell and Cattano indicate that their alleged injuries in the State Court Action also result from personal guaranties they entered in connection with the Purchase Transaction and guaranties provided to vendors, suppliers or creditors in connection with the operations of Debtor after the purchase.

In general, it is recognized that claims based on guaranties of corporate debt are derivative in nature. In the well-recognized case of <u>Mid-State Fertilizer Co. v. Exchange Nat. Bank of Chicago</u>, the Seventh Circuit noted that guarantors of corporate debt are viewed as contingent creditors of a corporation because when the corporation does not pay one of its creditors, the guarantor, upon payment of its obligations under the guaranty, succeeds to the original creditor's claim against the corporation. 877 F.2d 1333, 1336 (7th Cir. 1989). Like shareholders, creditors of a corporation indirectly gain and lose with the corporation's gains and losses. <u>Id.</u> Therefore, creditors of a corporation cannot recover directly for harms to the corporation. <u>Id.</u> The rational for this rule is clear, to prevent duplicative recoveries and unnecessary litigation by limiting recovery to the one party that represents all of the parties' interests, the corporation. <u>Id.</u> This is especially important in cases in which there are limited assets because "suits by shareholders, guarantors, and the like may well be efforts to divert the debtor's assets-to-pay off one set of creditors . . . while keeping the proceeds out of the hands of the firm's other creditors." <u>Id.</u>; <u>see also</u> Deborah A. DeMott and David F. Cavers, <u>Shareholder Derivative Actions: Law and Practice</u> § 2.3 (2016) ("Most courts decline to recognize a shareholder's individual standing to sue on the basis that the

shareholder has guaranteed a corporate obligation. . . . The shareholder guarantor does not suffer an injury distinct from the corporate injury although the corporate injury carries consequences for the shareholder-guarantor."). This rationale has also been followed by the District Court of South Carolina's holding in Umphlett Lumber Co. v. Trident Sys., Inc., 878 F.Supp. 844, 847 (D.S.C. 1995). In Umphlett, the court determined that guarantors of corporate debts (one of which was also a shareholder of the corporation) did not have standing to pursue breach of warranty claims as the guarantors did not have a separate and distinct injury because "[t]he gravamen of the pleadings [was] based on the economic loss to the corporation that indirectly resulted in the [shareholder and guarantor's] losses." Id. at 846–47. The Umphlett court continued: "[t]o allow [the shareholder and guarantors] to pursue individual claims against the Defendants 'would authorize multitudinous litigation and ignore the corporate entity . . . . Simply stated, the claimed damages are those of the corporation, not those of the [shareholders and guarantors]." Id. at 847 (quoting Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel, 20 F.3d 1311, 1318 (4th Cir. 1994)).

Despite this general view, however, it has been recognized that the guarantors of a corporate debt may recover directly when their injuries are separate and distinct from the harm suffered by the corporation. As put by the Seventh Circuit in Mid-State: "When [the guarantors] suffer direct injury-*injury independent of the firm's fate*-they may pursue their own remedies." Id. at 1336–37 (emphasis added); see also Taha v. Engstrand, 987 F.2d 505, 507 (8th Cir. 1993) ("Recovery is available, naturally, . . . when the [guarantor] suffered an injury separate and distinct from that suffered by other shareholders, creditors or guarantors."); Barger v. McCoy Hillard & Parks, 346 N.C. 650, 661 488 S.E.2d 215, 221 (1997) ("Individual actions may be prosecuted, however, if the guarantor can show . . . that the injury suffered by the guarantor is personal to him and distinct from the injury sustained by the corporation itself.").

25

*Analysis of Personal Guaranties*

According to the record, Campbell and Cattano entered nine guaranty agreements related to the Purchase Transaction—eight of which were given to various parties composed of the owners of TSMB and TSCLT, agents, insiders or related entities associated with TSMB and TSCLT's assets, the Seller Financing Guaranties,  and one guaranty which was given to Greenfield Commercial Credit, an arms-length third-party lender, chosen by Campbell and Cattano (and unrelated to the sellers) to facilitate the purchase and Debtor's operations.  They also assert injury as a result of a number of guaranties of other unspecified debts/loans of the Debtor associated with Debtor's subsequent operations.

*Greenfield Commercial Credit and Other Guaranties*

Campbell and Cattano allege that they provided the guaranty to Greenfield Commercial Credit ("Greenfield") due to the misrepresentations of asset value by the State Court Defendants and that upon collection of that guaranty, they suffered a direct injury. However, the record demonstrates that the guaranty was required by Greenfield as part of its arms-length third-party loan to Debtor, which was negotiated by Campbell and Cattano as part of Debtor's purchase of the assets of TSMB and TSCLT. The guaranty was apparently a requirement of Greenfield and a fairly common one for major operational loans made to a closely-held company. There is no evidence that the State Court Defendants directed Debtor or Campbell and Cattano to Greenfield or suggested the requirement of a guaranty. Further, it appears that the trigger for Campbell and Cattano's liability under the guaranties was the loss suffered by a default by Debtor under the Greenfield loan. Upon payment, Campbell and Cattano would become contingent creditors. Under the well-recognized approach of <u>Mid-State</u>, such injuries are derivative in nature. It further appears that the injuries related to the guaranties provided to vendors, suppliers and creditors of various

unspecified other debts incurred in Debtor's operations fall within the same analysis as they were provided to support Debtor's business and triggered by the overall corporate loss. They are therefore derivative in nature.

*Seller Financing Guaranties*

Campbell and Cattano's amended complaint may also be viewed to cover losses incurred due to the Seller Financing Guaranties they entered into directly with the State Court Defendants, as the sellers and suppliers under the Purchase Transaction, and other related entities to those parties. Under the analysis provided by <u>Mid-State</u>, to the extent that Campbell and Cattano can assert that they suffered harm resulting from an express breach of a guaranty contract or a violation of duties owed to them as parties to the Seller Financing Guaranties, there would be a direct claim, as recovery by the corporation would not address the guarantor's separate harm. <u>See</u> <u>Mid-State</u>, 877 F.2d at 1336. Additionally, South Carolina law recognizes that allegations of a lender's wrongful inducement to enter a guaranty may provide both an affirmative defense to payment under the guaranty as well as actionable fraud claim if actual damages can be demonstrated. <u>See</u> <u>Collins Music Co., Inc. v. FMV Corp.</u>, 355 S.C. 446, 451, 586 S.E.2d 128, 131 (2003) (noting that a guarantor's claim that the guarantor was fraudulently induced to enter a guaranty may be a defense to the collection of the guaranty or, if actual out-of-pocket damages can be established, an action for fraud against the lender/obligee). [18]

---

[18]    <u>See</u> <u>Merrill Lynch Bus. Fin. Servs., Inc. v. Gray Supply Co.</u>, Inc. 1991 WL 191454 (N.D. Ill. 1991) ("Because [guarantor] signed the agreements only as a guarantor, the import of allegations of fraudulent inducement [by misrepresenting its expertise in the salvage metal industry, guarantor's] signature as guarantor of the loans to [the corporation]. The claim for intentional misrepresentation relating to [the guarantor] is therefore direct and not derivative of [lender's] conduct toward and injury to [the corporation]."); <u>Bancroft Life & Casualty v. Lo</u>, 2013 WL 364239 (W.D. Penn. 2013) (finding guarantors had alleged individual claims for fraud and illegality when the defendant-insurance program induced the guarantors to execute guaranties to the defendants through misrepresentations); <u>eOnline v. Chicago Consulting Partners</u>, 2002 WL 484865 (N.D. Ill. 2002) (finding a guarantor's claim for fraudulent inducement to sign a personal guaranty was direct when lender made misrepresentations about the lender/merging company's financial profitability).

In this case, Campbell and Cattano claim the State Court Defendants made direct representations that induced them to enter the Seller Financing Guaranties. The common factor under those guaranties is that the alleged wrongful conduct or representations directly benefitted the State Court Defendants by making Campbell and Cattano personally liable under the Seller Financing Guaranties.[19] In as much as the facts surrounding these guaranties could provide a basis for a direct injury claim, those claims should not be barred.

*Indemnification*

In the Second State Court Action, Campbell and Cattano have alleged that the State Court Defendants owed them contractual and equitable indemnifications for certain losses associated with their guaranties given to trade vendors. Further, in the affidavits provided in this proceeding, they also allege indemnifications regarding their guaranties provided on the Greenfield loan, guaranties of other Debtor obligations and any other attempts to hold them liable for TSCLT and TSMB's obligations.

To the extent that Campbell and Cattano's claim for indemnification seeks to enforce the contractual indemnification provision contained in the A.P.A., the claim would be derivative as those remedies were provided to Debtor as the purchaser under the A.P.A., and not to Campbell and Cattano individually.

No other written indemnification agreements have been produced; however, Campbell and Cattano also assert that they received oral promises from certain of the State Court Defendants to

---

[19]    Furthermore, while all of the State Court Defendants may not have been the identified actors in the communications/misrepresentations, the holders of the Seller Financing Guaranties are all related entities to TSMB and TSCLT and parties who were jointly benefited by the alleged misrepresentations; therefore, as owners of or interest holders in the assets, they were or should have been aware of any misrepresentations of value.

indemnify them from certain losses.[20] These alleged promises and representations are described in general terms in their affidavits submitted in support of their response to the Trustee's Motion.[21]

To the extent that a separate, personal and binding oral indemnification agreement with the State Court Defendants exists, Campbell and Cattano may have distinct contractual obligations owed personally to them, which were not owed to Debtor. Separate promises made to shareholders in their individual capacities may create direct causes of action. See Kaplan v. First Options of Chicago, Inc. (In re Kaplan), 143 F.3d 807 (3d Cir. 1998) ("If [the shareholder] received promises in his individual capacity, he may sue for the breach of those promises.") Assuming for the purposes of this matter that their allegations as true, Campbell and Cattano, in their individual capacities as parties to the alleged oral agreements, would have standing to seek enforcement of those agreements and recover any damages resulting from any breach thereof; whereas, Debtor would generally not have standing to bring an action to enforce or recover damages on the alleged agreements as it was not a party to it. See Professional Bankers Corp. v. Floyd, 285 S.C. 607, 612, 331 S.E.2d 362, 364 (Ct. App. 1985) ("The general rule at common law is that an action on a contract must be brought by the party in whom the legal interest is vested, and this legal interest is ordinarily vested only in the promisee or promisor."). Therefore, such indemnification claims, to the extent that the alleged oral promises to indemnify Campbell and Cattano are valid, binding and enforceable, may be a direct claim. Further, to the extent that Campbell and Cattano can demonstrate direct injuries arising from their claim for equitable indemnification, Campbell and Cattano may have a direct claim.

---

[20]    While a future determination may be needed as to whether an oral agreement to indemnify for losses related to a guaranty is valid under South Carolina's statute of frauds, it is not necessary to the Court's present consideration and ruling.

[21]    The record is limited concerning the details of the representations, including who made them, when they were made and in what capacity the speaker made these representations. However, the Trustee did not file any counter affidavits regarding these allegations for the Court's consideration.

*Loss of Personal Credit, Reputation and Other Financial Hardships*

In connection with losses of monies due to their investment in Debtor and guaranties associated with the Purchase Transaction and subsequent operations of Debtor, Campbell and Cattano assert a loss of personal credit, reputation and miscellaneous financial hardships. Whether such damages are allowable under state law and can be proven are best determined by the state court.

However, for the purposes of this Order, such injuries appear ancillary to and derived, if at all, from the associated monetary loss claimed and therefore follow the nature of those claims. Based upon the analysis stated herein, to the extent damages for loss of personal credit, reputation and other financial hardships are proximately related to claims associated with the Seller Financial Guaranties, equitable indemnification and oral indemnification agreements, they may be direct. All other claims for such injuries appear derivative.[22]

## CONCLUSION AND INJUNCTIVE RELIEF

The Trustee seeks summary judgment that all of the claims in the Second State Court Action are derivative claims and their prosecution should be barred. However, it appears that the amended complaint in the Second State Court Action, as clarified by the affidavits submitted in this proceeding, may state certain direct claims for harm that are separate and distinct to Campbell and Cattano.[23] Specifically, based upon this Court's review of the alleged injuries, Campbell and Cattano may have direct injuries proximately related to their losses derived from being parties to

---

[22]     At hearing, the Trustee also argued that the Campbell and Cattano were agents and employees when the alleged pre-A.P.A. misrepresentations about TSMB and TSCLT were made; and therefore, Campbell and Cattano cannot allege they reasonably relied on those misrepresentations as they are bound by TSMB and TSCLT's disclaimer of representations included in the A.P.A. Based on the above ruling, it is not necessary to address these arguments at this time.

[23]     The amended complaint in the Second State Court Action includes general allegations made by pro se parties. Therefore the Court has taken care to apply a less stringent standard in reviewing its allegations. See Haines v. Kerner, 404 U.S. 519, 520–21, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972 (per curiam) (holding that a pro se complaint is held to a less stringent standard than a formal pleading drafted by an attorney).

30

the Seller Financing Guaranties and from alleged oral promises from certain of the State Court

Defendants to indemnify them for certain losses.    All other claims appear derivative as property

of the estate.

Therefore, the Court finds it proper to grant a permanent injunction, which enjoins

Campbell, Cattano and any other party from prosecuting claims in the State Court or otherwise to

the extent they pursue derivative injuries as determined in this Order. Such derivative injuries

include their loss of investment, lost opportunity costs and time, and (with the exception of their

indemnification cause of action and the losses stemming from the Seller Financing Guaranties) the

losses resulting from the guaranties of debt incurred by the Debtor in its operations as well as any

related claims for loss of personal credit, reputation and other financial hardships associated with

those guaranties. Prosecution of the claims in the Second State Court Action seeking recovery for

these injuries will be a violation of the automatic stay under 11 U.S.C. § 362, this Court's prior

orders and this Order. However, to the extent they can demonstrate that they have direct injuries,

they may recover for injuries proximately related to the Seller Financing Guaranties, the alleged

oral promises to indemnify as well as any claim for equitable indemnification.

### Future Proceedings in this Matter

As a consequence of the Second State Court Action, the state court is familiar with the facts

and issues presented and has before it all of the required parties needed to make a full factual

inquiry into the remaining matters.

While this Court temporarily denied Campbell and Cattano's abstention request, this

determination was based in part on the parties' representation that they believed this matter could

be fully concluded in an expeditious fashion at the summary judgment stage. However, making a

further determination about the nature of the remaining claims would likely require testimony and

evidence from all parties as well as the State Court Defendants who are not parties to this proceeding. Upon the issuance of this Order, the most efficient resolution of the remaining issues appears to be with the state court.[24]

Therefore, for these reasons, in the interest of judicial economy and in comity with state court, the Court finds that the state court is now the appropriate and most efficient forum to determine if the injuries proximately related to the Seller Financing Guaranties, the alleged oral promises of indemnification and the alleged equitable indemnification claim are direct and if so, the resulting liability. In determining the nature of those claims and liabilities therein, the state court shall not interfere with this Court's prior orders or permit the prosecution of derivative injuries as indicated in this Order. Campbell, Cattano and any other party are hereby enjoined from proceeding to prosecute or sustain the derivative claims and injuries described herein.

The present adversary proceeding is hereby concluded and shall be closed, and the interim stay of the Second State Court Action that was entered by the oral ruling on February 26, 2016 and supplemented by further order on March 16, 2016 is hereby lifted in strict accordance with the terms and requirements of this Order.

**AND IT IS SO ORDERED.**

---

[24] Another consideration in the Court's previous determination to not abstain was a question regarding the scope of the bankruptcy trustee's duties to defend the settlement agreements approved by its 6/8/15 Order and whether the Trustee's settlements could be upset if the Court abstained from this proceeding, resulting in a significant effect on the administration of Debtor's bankruptcy estate. However, after review of the settlement agreement and the record, it appears to the Court that the Trustee has fully satisfied his obligations under the settlement agreement by commencing and prosecuting this adversary proceeding. The Trustee has acted in good faith and has competently, zealously and thoroughly prosecuted this matter. The Court is satisfied with the Trustee's efforts to defend and uphold the terms of the settlement agreement and finds that duty is completed. Based on the review of the record and settlement agreement, the Court finds that the Trustee is not required to intervene in the continued proceedings of the Second State Court Action.